1
2
3
4
5
6
7
8
9
10          **IN THE UNITED STATES DISTRICT COURT**
11        **FOR THE EASTERN DISTRICT OF CALIFORNIA**
12
13  DANG VANG,                              CASE NO. CV F 04-6702 OWW LJO
14              Plaintiff,
                                            **FINDINGS AND RECOMMENDATIONS ON**
                                            **SOCIAL SECURITY COMPLAINT**
15      vs.                                 (Docs. 15, 17.)
16  JO ANNE B. BARNHART,
    Commissioner of Social
17  Security,
18              Defendant.
19  _____/
20                    **INTRODUCTION**
21          Plaintiff Dang Vang ("plaintiff") seeks this Court's review of an administrative law judge's
22  ("ALJ's") decision that plaintiff is neither disabled nor entitled to disability insurance benefits and
23  Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act ("Act"), 42
24  U.S.C. §§ 401-433 and 1381-1382c.  Based on review of the Administrative Record ("AR") and the
25  papers of plaintiff and defendant Jo Anne B. Barnhart, Commissioner of Social Security
26  ("Commissioner"), this Court RECOMMENDS to DENY plaintiff's request to reverse the
27  Commissioner's decision to deny plaintiff disability insurance benefits and SSI or to remand for further
28  proceedings.

                                   1

# BACKGROUND

## Personal Background

Plaintiff is age 48 and has limited ability to communicate effectively in English, some adult schooling, and past relevant work as a security guard, glass cutter and assembler.  (AR 17, 78, 106, 279.)

## Administrative Proceedings

On March 28, 2002, plaintiff protectively filed his disability insurance benefits and SSI applications to claim disability since September 26, 2001 based on diabetes, high cholesterol, chest and abdominal pain and body aches. (AR 66, 254.)  With its June 20, 2002 Notices of Disapproved Claims, the Social Security Administration ("SSA") denied plaintiff's claims and determined that plaintiff's condition is not severe enough to prevent him to work. (AR 49, 257.)  On August 8, 2002, plaintiff filed his Request for Reconsideration to claim that he is unable to work because of diabetes, high blood pressure, poor vision, and chest, stomach and leg pain. (AR 53.)  With its October 4, 2002 Notices of Reconsideration, SSA denied plaintiff's claims and again determined that his condition is not severe enough to prevent him to work. (AR 55, 261.)

On December 3, 2002, plaintiff filed his Request for Hearing by Administrative Law Judge to claim he is totally disabled. (AR 59.)  After a September 17, 2003 hearing, the ALJ issued her December 19, 2003 decision to conclude that plaintiff is able to perform his past relevant work as a security guard. (AR 14-22.)

Plaintiff submitted to SSA's Appeals Council his December 30, 2003 Request for Review of Hearing Decision. (AR 12, 13.)  On October 20, 2004, the Appeals Council denied plaintiff's request for review to render the ALJ's December 19, 2003 decision as the Commissioner's final decision subject to this Court's review. (AR 6-8.)

## Medical History And Records Review

Plaintiff treated for various issues, including diabetes, chest, abdominal and leg pain, hypertension, and poor vision.

### *St. Agnes Medical Center*

On March 11, 2001, plaintiff presented to the St. Agnes Medical Center emergency room with complaints of inability to eat or drink, decreased mental status, weakness and chest pain. (AR 123-124.)

2

He remained in the hospital for tests and observation until his March 13, 2001 discharge. (AR 125.)  A cardiac X-ray showed "[n]o acute abnormality." (AR 134.)  The plaintiff also underwent cardiac stress testing which at peak exercise revealed neither cardiographic changes nor EKG changes suggestive of myocardial ischemia. (AR 111, 112.)  A myocardial infarction was ruled out, and plaintiff was diagnosed with chest pain, mild diabetes mellitus, mild hypokalemia (low potassium), and degenerative arthritis of the right shoulder. (AR 121.)  At the time, plaintiff denied urgency or frequency of urination, history of rheumatoid arthritis, gouty arthritis or swollen joints or feet. (AR 124.)  The discharge form noted that the plaintiff could return to work on March 14, 2001 and that he should follow up with a diabetic clinic. (AR 125.)

### Hing B. Luong, M.D., Treating Physician

Twice in October 2001, treating physician Hing B. Luong, M.D. ("Dr. Luong"), noted that plaintiff failed to undergo blood tests and to perform home testing due to fear of pain. (AR 141-142.) Dr. Luong diagnosed diabetes and obesity. (AR 141.)  On October 1, 2001, Dr. Luong noted plaintiff's "feet [were] okay." (AR 142.)  On January 29, 2002, plaintiff complained of pain and weakness in his right arm. (AR 140.)  After noting no muscular atrophy, Dr. Luong diagnosed plaintiff with carpel tunnel on the right side and prescribed Motrin. (AR 140.)  On February 4, 2002 visit, plaintiff complained of an occasional cough, difficulty breathing at night, and burning in stomach area that was "partly relieved with antacid." (AR 139.)  Dr. Luong prescribed an Albuterol inhaler and Zantac. (AR 139.)

### Fresno Community Hospital

On February 19, 2002, plaintiff was admitted to Fresno Community Hospital for chest pain, which plaintiff claimed he had experienced for the past two weeks and which was constant for the first few days, became intermittent, was unrelated to exertion, and was mostly at night. (AR 153.)  Plaintiff also complained of fatigue, dizziness, and body weakness.  (AR 153.)  Treatment notes indicated plaintiff had been to the emergency room three times in 2001 for chest pain. (AR154.)  The notes further indicated plaintiff had full normal range of motion of his extremities. (AR 155.)  A chest X-ray taken on admission revealed normal pulmonary vascular distribution and neither cardiomegaly, pulmonary infiltrate, pleural effusion, nor active pulmonary disease. (AR 155, 158.)   An emergency room electrocardiogram recorded a normal sinus rhythm. (AR 155.)  On his February 20, 2002 discharge,

1  plaintiff was assessed with chest pain without myocardial infarction, type II diabetes mellitus in poor
2  control, and hypokalemia. (AR 155.)

3  *Madhava R. Narala, M.D., Treating Physician*

4  Plaintiff treated with Madhava R. Narala, M.D. ("Dr. Narala"), and on February 27, 2002,
5  complained of chest pain and pressure, dizziness, blurred vision, and nausea for the past two weeks.
6  (AR189.)  Plaintiff denied headaches, chronic fatigue and shortness of breath. (AR189.)

7  Plaintiff had five visits with Dr. Narala in during March to May 2002 and complained of fever,
8  chills, sweats, fatigue, nausea, dizziness, headaches, neck and stomach pain, tingling in arms, and veins
9  feeling tight. (AR 183-186, 206.)  Dr. Narala assessed high cholesterol, neck complaints and carpal
10  tunnel syndrome. (AR 185, 206.) Dr. Narala prescribed Celebrex, Flagyl, Maalox, Zantac, Doxycycline,
11  Vioxx and Prevacid during the five visits. (AR 185, 186, 189, 206.)

12  Plaintiff had five visits with Dr. Narala during August 2002 and complained of headaches, chest
13  and foot pain, and tightness in hands and arms. (AR 197-198, 202-203, 205.)  Dr. Narala prescribed
14  Indocin for plaintiff's gout on August 8, 2002. (AR 203.)  Dr. Narala noted during the August 12, 2002
15  visit that the plaintiff had not taken the Indocin because "he developed [an] allergy to a green pill in part,
16  but doesn't know the name."(AR 202.)  Dr. Narala then discontinued the Indocin. (AR 202.)

17  During October to December 2002, plaintiff continued to see Dr. Narala and complained of foot,
18  abdominal and chest pain, fatigue, shortness of breath, and too much blood flowing to head.  (AR 236-
19  237, 239-240.)  Dr. Narala's prescriptions included Indomethacin. (AR 246.)

20  In his November 6, 2002 letter addressed, Dr. Narala indicated that he had treated plaintiff for
21  the past two years and that plaintiff suffered "severe polyarticular gout" and must use a cane to walk.
22  (AR 213.)  Dr. Narala stated that in his "best judgment, [plaintiff] is disabled and cannot perform any
23  gainful work." (AR 213.)

24  On December 9, 2002, Dr. Narala completed a "Questionnaire" to indicate that plaintiff was
25  precluded from working due to "severe and intractable joint pains due to gout." (AR 246-247.)  Dr.
26  Narala noted that plaintiff was able to sit or stand/walk for two hours in an eight-hour work day.  (AR
27  246.)  As to objective findings to support such restrictions, Dr. Narala noted "swelling and tenderness
28  of both ankles and shoulders" and that plaintiff had additional limitations from bilateral carpal tunnel

4

syndrome, neuropathy, diabetes and urinary incontinence.  (AR 247.)  Dr. Narala indicated that plaintiff's carpal tunnel syndrome was associated with nerve conduction studies and decreased strength in both hands. (AR 247.)  Dr. Narala assessed that plaintiff was able to lift ten pounds frequently and five pounds occasionally. (AR 247.)  As to hand activities, Dr. Narala commented that plaintiff could perform no manipulative activities except "feeling," which he could do continuously for 50 percent of a work day. (AR 247.)  With regards to how long at one time which plaintiff was able to feel without resting his hands, Dr. Narala noted "all [the] time." (AR 247.)  Dr. Narala estimated plaintiff had been disabled since February 27, 2002 based on Dr. Narala's assessed limitations. (AR 247.)

Plaintiff had five visits with Dr. Narala during January to July 2003, and plaintiff's complaints included headaches, dizziness, neck, shoulder, chest, back and abdominal pain, acne, running, stuffy nose, cough, and fever for which Dr. Narala prescribed medications. (AR 215-217, 224-228.)  January 2003 chest x-rays revealed neither vascular congestion nor acute cardiopulmonary disease." (AR 226.)

### *Clovis Community Hospital*

On March 6, 2002, plaintiff presented to Clovis Community Hospital for chest pain and shortness of breath and was diagnosed with chest pain, mild hypokalemia, and a history of diabetes mellitus. (AR 162.)  A physical examination revealed no edema of the feet. (AR 162.)  Plaintiff was admitted to telemetry and had normal sinus rhythm, an EKG with no acute change, and normal cardiac enzymes. (AR 162.)  X-rays revealed no active chest disease. (AR 173.)  Treatment notes indicated that plaintiff had a history of degenerative arthritis treated with Celebrex. (AR 164.)  Plaintiff was recommended to take a stress test but refused and insisted to go home. (AR 162, 163.)  At discharge, his condition was fair. (AR 163.)

### *Rustom F. Damania, M.D., Consultative Physician*

Internist Rustom F. Damania, M.D. ("Dr. Damania"), performed a June 4, 2002 consultative examination. (AR 190-193.)  Dr. Damania characterized plaintiff's complaints as "extremely vague." (AR 190.)  Plaintiff complained that his hands had hurt for the past two weeks. (AR 190.)  Plaintiff further complained of headaches and tightness in his neck for the past four months. (AR 190.)  Dr. Damania noted that plaintiff had no chest pain since extensive testing at St. Agnes Hospital and Fresno Community Hospital showed plaintiff's normal heart. (AR 190.)  Upon exam, plaintiff had a normal gait

but refused to walk on his toes and heels for fear of falling. (AR 192.) Dr. Damania noted plaintiff's normal ranges of motion in all of joint systems and most of his spine on active basis. (AR 192.) According to Dr. Damania, on a passive basis, plaintiff refused to cooperate and indicated that he was unable to perform passive range of motion. (AR 192.) Dr. Damania also noted there were "[n]o signs of acute or chronic inflammation such as redness, swelling tenderness or crepitations" in any of the joints. (AR 192.) Dr. Damania found that the cervical and thoracic spine were normal but as to the lumbar spine, plaintiff was "not very cooperative with range of motion testing." (AR 192.) Dr. Damania noted neither spasms in the lumbar spine nor evidence of radiculopathy (negative straight leg raise test), and that plaintiff was able to get on and off the examination table without difficulty.  Dr. Damania observed that for flexion, extension and lateral flexion, plaintiff was unwilling to go beyond 60, 15 and 15 degrees, respectively. (AR 192.) For the hands, Dr. Damania's tests for carpal tunnel syndrome were negative (Tinel's and Phalen's) in that plaintiff had normal grip strength and neither atrophy of the palmar muscles nor sensory impairment. (AR 193.) Dr. Damania's diagnosis was limited to diabetes with no evidence of end organ damage. (AR 193.) Dr. Damania "did not find any objective evidence for gross physical disability." (AR 193.) Dr. Damania further found that plaintiff lacked exertional limitations, postural limitations with bending, stooping or crouching, manipulative limitations with reaching, handling, feeling, grasping or fingering, and visual or communicative impairments. (AR 193.) Dr. Damania opined that plaintiff "should have no difficulty working, walking or sitting eight hours out of a normal eight hour workday with normal breaks." (AR 193.)

### *Non-Examining State Agency Physicians*

On June 19, 2002, Ernest Wong, M.D. ("Dr. Wong"), a state agency physician, reviewed the record and concluded that plaintiff did not have a severe physical impairment. (AR 211-212.)  On October 6, 2002, state agency physician Sadda Reddy, M.D. ("Dr. Reddy"), reviewed the record and agreed that plaintiff did not have a severe physical impairment. (AR 207-208.)

### *Mahendra Nath, M.D., Treating Physician*

On August 20, 2002, treating physician Mahendra Nath, M.D. ("Dr. Nath"), examined plaintiff in conjunction with his complaints of hand pain and weakness at Dr. Narala's request. (AR 242-243, 250-251.) Dr. Nath indicated that plaintiff had diffuse tenderness in both wrists with a positive Tinel's

sign and decreased grip strength.  (AR 243, 251.)  Dr. Nath noted plaintiff's normal range of motion in his shoulders, elbows, wrists and lower extremities. (AR 243, 251.)   Dr. Nath observed diffuse tenderness in plaintiff's back but neither definite radioculopathy nor gross motor deficits. (AR 243, 251.) Dr. Nath noted that plaintiff had symmetrical reflexes and was not limping. (AR 243, 251.)  Dr. Nath assessed that plaintiff suffered from bilateral compression neuropathy, cervical strain, diabetes and high blood pressure.  (AR 243, 251.)  Dr. Nath instructed the plaintiff in therapeutic exercises for his neck and back discomfort.  (AR 243, 251.)

On August 12, 2003, Dr. Nath saw plaintiff for nerve conduction studies. (AR 248-249.)  Dr. Nath concluded there was a "slight prolonged sensory distal latency in both median nerves" and a "slightly slowed motor nerve conduction velocity right ulnar nerve for the segment across the elbow." (AR 249.)  Dr. Nath concluded that the electrodiagnostic findings were "minimally abnormal" and "consistent with diabetic neuropathy." (AR 249.)

### Bipin K. Joshi, M.D., Consultative Physician

On January 15, 2003 on Dr. Narala's referral, Bipin K. Joshi, M.D. ("Dr. Joshi"), conducted a consultative examination to address plaintiff's chest discomfort. (AR 230-232.) Plaintiff explained that he had experienced on and off chest discomfort for the past two weeks and which included tightness substernally across the upper chest and radiating to his left arm, shortness of breath, dizziness and headache. (AR 230.) Dr. Joshi found plaintiff in no acute distress and assessed chest pain, hypertension, diabetes and hyperlipidemia.  (AR 231.)  Dr. Joshi discussed with plaintiff options, including cardiac catheterization which plaintiff rejected because he "wants to be treated with medications." (AR 231.) Dr. Joshi indicated that plaintiff had risk factors, that there was a high probability that plaintiff had underlying coronary artery disease, and that plaintiff was not interested in further testing. (AR 231.) Dr. Joshi started plaintiff on baby aspirin, beta blocker and nitroglycerin. (AR 231.)

### Jagdev Singh, M.D., Examining Physician

Plaintiff sought treatment for hearing loss on September 9, 2003, from Dr. Jagdev Singh, M.D. ("Dr. Singh"). (AR 252.) Dr. Singh noted that plaintiff had tinnitus in his left ear and indicated hearing loss in the right ear. (AR 252.)  Neither treatment recommendations were made nor testing methods or results indicated.  (AR 252.)

*Medications*

Plaintiff's medications have included Acetaminophen, Acetaminophen with codeine, Actos, Albuterol, Aspirin, B12, Bentyl, Bupropion, Celebrex, Cytotec, Doxycycline, Flagyl, Glyburide, Indocin, Indomethacin, Klor-con, Lipitor, Maalox, Metformin, Micronase, Motrin, NitroQuick, potassium, Pravchol, Prevacid, Ranitidi, Trazadone, Vioxx, Vitacon Forte CP, and Zantac. (AR 84, 108-109, 121, 139, 140, 154, 163, 164, 185-186, 189, 203, 206, 228, 231.)

**Plaintiff's Activities And Testimony**

*Questionnaires And Statements*

Plaintiff completed an April 24, 2002 Disability Report Adult to note he is 5-foot-1 and weighs 135 pounds. (AR 76.)  Diabetes, high cholesterol, chest and abdominal pain, and body aches limit plaintiff's ability to work, stand and sit. (AR 77.)  Physical work increases body pain. (AR 77.)  During 1993-1996, plaintiff worked as a glass cutter.  (AR 78.)  During 1996-1999, plaintiff worked as a security guard.  (AR 78.)  During February 1999 to September 2001, plaintiff worked as an assembler which required him to lift up to 20 pounds frequently. (AR 78.)  Plaintiff's medical problems started in May 2001 and prevented him to work as of September 26, 2001 when he was "laid off." (AR 77.)

Plaintiff completed a May 15, 2002 Work History Report to note that during 1993-1994, plaintiff was a glass cutter at an optometrist's office.  He called people to schedule appointments, pulled files, and wrote reports while seated. (AR 96.)  He worked eight hours at a time and was required to lift only things less than 10 pounds. (AR 96.)  As a security guard from 1996 until 1997, plaintiff used equipment and completed forms noting what he observed during his shift. (AR 95.)  He walked and stood for eight hours a day but never was required to lift more than 10 pounds. (AR95.)  Plaintiff worked as an assembler during February 1999 to September 2001. (AR 93.)  The job required plaintiff to use his technical knowledge and skill to operate machines.  (AR 93.)  Plaintiff was required to sit eight hours a day and handle, grab and grasp big objects weighing around 10 pounds frequently.  (AR 94.)

Plaintiff completed a March 20, 2002 Reconsideration Disability Report to note his inability to work or walk and that his legs and feet swell.  (AR 98.)  Plaintiff's arms feel numb from the elbow down and his vision is blurred.  (AR 98.)  Plaintiff experiences blackouts and has stomach and chest pain. (AR 98.)  Plaintiff needs no help caring for his personal needs. (AR 100.)

***Plaintiff's ALJ Hearing Testimony***

Plaintiff testified at the September 17, 2003 ALJ hearing that he lives with his wife and eight children. (AR 275-276.)  He has a driver's license, and usually drives his children to and from school in a pickup truck with a manual transmission but does not drive when he has foot pain. (AR 276-277.) Plaintiff has a limited education of three years of schooling in Laos and adult schooling in the United States but is unable to read or write in English.  (AR 279.)  Plaintiff became a soldier in Laos by age 11.  (AR 279.)

Plaintiff last worked as a security guard, where his supervisor spoke and gave instructions in English but told him that he "didn't have to know English that much to be able to get the job." (AR 278.) A Hmong person also worked there and spoke to the plaintiff. (AR 278.)  Plaintiff stopped working because of language problems but later said he stopped working because of chest pain, "heart problem pain" and foot gout. (AR 278-279.)  Plaintiff used a crutch at the hearing, which he said was for pain in his left foot, but when that foot gets better the pain moves to the right foot. (AR 280-281.)  Plaintiff stated his foot turns red, but it does not swell. (AR 281.)  Plaintiff has ankle swelling and pain. (AR 282.)  Pain is present more often than not, usually lasts two to five weeks at a time, and prevents plaintiff to walk. (AR 282.)  When using the crutches given to him by a doctor, plaintiff can stand for five minutes at a time. (AR 283.)

Plaintiff testified he takes medication for diabetes "all the time[,]" which reduces his need to urinate excessively a "little bit." (AR 284-285.)  He urinates ten times per night and every 30 minutes during the day. (AR 290.)  A diabetic diet helps him a little bit, and diabetic medication reduces his fatigue. (AR 285-286.)  His doctors recommended no changes in his diabetic medications.  (AR 287.) Doctors told plaintiff to eat lots of meat, but he eats a "little bit of meat" with rice and vegetables.  (AR 289.) Plaintiff also testified that when he went to the hospital with complaints of chest pain, he was told the pain was not in his heart, but rather his stomach. (AR 289.)

Plaintiff's hearing loss makes him sad and sometimes he feels like he wants to die. (AR 293.) Plaintiff watches his children when he does not have pain but does nothing around the house when he experiences pain. (AR 291.)

/ /

### The ALJ's Findings

In her December 19, 2003 decision, the ALJ identified a specific issues whether plaintiff is disabled as defined by the Act.  (AR 17.)  In concluding plaintiff is not disabled and thus ineligible for disability insurance benefits and SSI (AR 21), the ALJ found:

1.   Plaintiff severe impairments of diabetes mellitus with bilateral compression neuropathy, cervical strain with back pain, hypertension and polyarticular gout.

2.   Plaintiff has no impairment or combination of impairments that meet or medically equal an impairment in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1 ("Listing of Impairments").

3.   Plaintiff's testimony is not fully credible.

4.   Plaintiff is able to lift/carry 20 pounds occasionally and 10 pounds frequently, to stand and walk six hours in an eight-hour workday, to sit six hours in an eight hour workday, and to crouch, crawl, climb stairs and kneel occasionally, and is unable to walk on uneven or rough terrain or to climb ladders, ropes or scaffolds.

5.   Plaintiff's past relevant work as a security guard did not require the performance of work-related activities precluded by his residual functional capacity.

6.   Plaintiff is able to perform past relevant work.

9.   The claimant was not disabled since September 26, 2001.  (AR 21-22.)

### DISCUSSION

### Standard Of Review

Congress has provided limited judicial review of a Commissioner's decision made through an ALJ.  *See* 42 U.S.C. § 405(g).  A court must uphold the Commissioner's decision, made through an ALJ, when the determination is not based on legal error and is supported by substantial evidence.  *See Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985); *Sanchez v. Secretary of Health & Human Services*, 812 F.2d 509, 510 (9th Cir. 1987) (two consulting physicians found applicant could perform light work

/ / /

/ / /

/ / /

10

1   contrary to treating physician's findings).[1]   Substantial evidence is "more than a mere scintilla,"

2   *Richardson v. Perales*, 402 U.S. 389, 402, 91 S.Ct. 1420 (1971), but less than a preponderance,

3   *Sorenson v. Weinberger*, 514 F.2d 1112, 1119, n. 10 (9th Cir. 1975). Substantial evidence "means such

4   evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S.

5   at 401, 91 S.Ct. 1420; *Sandgathe*, 108 F.3d at 980.

6          The record as a whole must be considered, weighing both the evidence that supports and detracts

7   from the Commissioner's conclusion. *Sandgathe*, 108 F.3d at 980; *Jones,* 760 F.2d at 995. If there is

8   substantial evidence to support the administrative finding, or if there is conflicting evidence that will

9   support a finding of either disability or nondisability, the finding of the Commissioner is conclusive.

10  *Sprague v. Bowen*, 812 F.2d 1226, 1229-1230 (9th Cir. 1987). If the evidence is susceptible to more than

11  one rational interpretation, the court may not substitute its judgment for that of the Commissioner.

12  *Tackett v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1999); *Morgan v. Commissioner*, 169 F.3d 595, 599 (9th

13  Cir. 1999).

14         This Court reviews the ALJ's decision pursuant to 42 U.S.C. § 405(g) to determine whether it

15  is: (1) based on proper legal standards; and (2) supported by substantial evidence in the record as a

16  whole.  *Copeland v. Bowen*, 861 F.2d 536, 538 (9th Cir. 1988).  "A decision of the ALJ will not be

17  reversed for errors that are harmless."  *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005).

18         Plaintiff bears the burden to prove that he is disabled which requires presentation of "complete

19  and detailed objective medical reports of his condition from licensed medical professionals." *Meanel*

20  *v. Apfel*, 172 F.3d 1111, 1113 (9th Cir. 1999) (citing 20 C.F.R. §§ 404.1512(a)-(b), 404.1513(d)).

21  Plaintiff must furnish medical and other evidence about plaintiff's medical impairments.  20 C.F.R. §§

22  404.1512(a), 416.912(a); ("[Y]ou must bring to our attention everything that shows that you are blind

23  or disabled."); 20 C.F.R. §§ 404.1514, 416.914 ("We need specific medical evidence to determine

24  whether you are disabled or blind.  You are responsible for providing that evidence.")

25         Here, plaintiff claims disability since September 26, 2001 primarily due to diabetes, high

26  _____

27         [1]      "The district court properly affirms the Commissioner's decision denying benefits if it is supported by

28  substantial evidence and based on the application of correct legal standards."  *Sandgathe v. Chater*, 108 F.3d 978, 980 (9th Cir. 1997).

1   cholesterol, poor vision, and chest, stomach and leg pain.  (AR 55, 66, 77.)

2   _____With the above standards in mind, this Court turns to plaintiff's criticism of the ALJ's December

3   19, 2003 decision.

### Dr. Narala's Opinion

5   In a jumbled approach, plaintiff questions the ALJ's evaluation of Dr. Narala's opinion.  The

6   Commissioner responds the ALJ provided several valid reasons for discounting the opinion rendered

7   by Dr. Narala.

8   A treating physician's opinion is not conclusive as to a claimant's physical condition or the

9   ultimate issue of disability and may be disregarded by the ALJ even when it is not contradicted.

10  *Rodriquez v. Bowen*, 876 F.2d 759, 761-762, n. 7 (9th Cir. 1989); *Magallanes v. Bowen*, 881 F.2d 747,

11  751 (9th Cir. 1989); *Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992).[2]  An ALJ may reject a

12  treating physician's opinion whether or not it is contradicted, if the opinion is "brief and conclusory in

13  form with little in the way of clinical findings to support its conclusion."  *Magallanes,* 881 F.2d at 751.

14  Inconsistencies and ambiguities in a treating physician's opinion regarding disability may constitute

15  specific, legitimate reasons to reject the opinion.  *Matney*, 981 F.2d at 1020.

16  The Ninth Circuit has further explained:

17          To reject the opinion of a treating physician which conflicts with that of an
        examining physician, the ALJ must "'make findings setting forth specific, legitimate
18      reasons for doing so that are based on substantial evidence in the record.'" . . . "The ALJ
        can meet this burden by setting out a detailed and thorough summary of the facts and
19      conflicting clinical evidence, stating his interpretation thereof, and making findings." .
        . . The rule . . . does not apply, however, "when the nontreating physician relies on
20      independent clinical findings that differ from the findings of the treating physician." . .
        . "'[T]o the extent that [the nontreating physician's] opinion rests on objective clinical
21      tests, it must be viewed as substantial evidence . . .'"

22  *Magallanes*, 881 F.2d at 751(citations omitted.)

23  An ALJ may reject a treating physician's report based on a claimant's exaggerated claims.  *See,*

24  *e.g., Sandgathe*, 108 F.3d at 980.  A physician's opinion of disability "premised to a large extent upon

25  claimant's own accounts of his symptoms and limitations" may be disregarded where those complaints

26  _____

27      [2]      A treating physician's opinion is not conclusive as to claimant's disability as this ultimate issue is an
    administrative finding reserved to the Commissioner.  20 C.F.R. § 404.1527(e).  The Commissioner has final responsibility
28  to determine a claimant's residual functional capacity.  20 C.F.R. § 404.1546.

have been "properly discounted." *Fair v. Bowen*, 885 F.2d 597, 605 (9th Cir. 1989) (citing *Brawner v. Sec. of Health & Human Servs.*, 839 F.2d 432, 433-434 (9th Cir. 1988)); *see Saelee v. Chater*, 94 F.3d 520, 522 (9th Cir. 1996), *cert. denied*, 519 U.S. 1113, 117 S.Ct. 953 (1997) ("no physician has been able to find a link between [claimant's] complaints and known medical pathologies").

"[T]he ALJ is responsible for determining credibility, resolving conflicts in the medical testimony, and for resolving ambiguities." *Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1998). Inconsistencies and ambiguities in a treating physician's opinion regarding disability may constitute specific, legitimate reasons to reject the opinion. *Matney*, 981 F.2d at 1020.

After she thoroughly reviewed the medical evidence, the ALJ interpreted the evidence and made findings:

> I afford little evidentiary weight to Dr. Narala's opinion. First and foremost, I find objective indications and abnormalities listed in support of the stated restrictions are inaccurately cited and contradicted by the record. I find nothing in Dr. Nath's report of the nerve conduction studies to indicate either carpal tunnel syndrome or significantly limited functional capacity. While clearly the claimant exhibits some diabetic neuropathy, Dr. Nath termed the abnormality as determined by objective testing "slight." Likewise, while Dr. Nath reports decreased grip strength, he provides no suggestion this is significant in nature and reports no findings that could reasonably be expected to result in an inability to walk, stand, or sit more than four hours in a day. Similarly, I find no evidence that suggests the claimant can not lift more than 10 pounds and no medical reason why he should not. The claimant has consistently tested with normal uric acid levels, a primary indicator of gout, and thus, the signs and symptoms of gout as provided throughout the record fail to support a problem of the magnitude Dr. Narala proposes. To the contrary, the evidence suggests that the claimant's symptoms relative to gout are resolved with medication (Exhibit 7F, pp. 8,11). Secondly, then, I find that Dr. Narala's treatment of the claimant does not support the extent of limitations he proposes. Finally, I find that Dr. Narala's opinion differs dramatically from every other opinion in evidence, and thus, it remains grossly inconsistent with the record in its entirety. (AR 20.)

Here, the ALJ properly discounted Dr. Narala's opinion as to plaintiff's suffering from carpal tunnel syndrome because its supposedly supporting study contradicted the opinion. Dr. Nath's nerve conduction study found that plaintiff's neuropathy was "minimally abnormal" and "consistent" with that of a diabetic. (AR 247-248.) In addition, the ALJ properly discounted Dr. Narala's conclusion that the plaintiff is unable to lift more than 10 pounds frequently and 5 pounds occasionally during a work day because of the absence of clinical findings to support that conclusion. (AR 247.)

As to Dr. Narala's determination that the plaintiff suffers from "severe and intractable joint pains due to gout," the ALJ properly afforded it little weight because of inconsistency with the medical

13

evidence. (AR 246.)  The ALJ noted that August 2002 laboratory tests showed plaintiff's uric acid within normal levels. (AR 201, 204, 246.) In addition, the record contains contradictions of Dr. Narala's opinion in that although Dr. Narala found swelling, redness and tenderness in the first metatarsophalangeal joint of plaintiff's great toe, plaintiff testified swelling was limited to his ankle and not in the foot (AR 202, 281).  Dr. Nath noted on August 20, 2002, eight days after Dr. Narala had seen the plaintiff for acute gout, that plaintiff was "not limping" and had full range of motion in the shoulders, elbows and wrists.  (AR 202, 243.) Dr. Reddy, a state agency physician concluded the acute gout was resolved in that plaintiff did not mention it when plaintiff next saw Dr. Narala and plaintiff's lab tests were normal.  (AR 208.)

Moreover, the ALJ properly discounted Dr. Narala's opinion because the conservative treatment he prescribed was inconsistent with the severity of the limitations which he assessed.  *See Johnson v. Shalala*, 60 F.3d 1428, 1434 (9th Cir. 1995) ("conservative treatment" suggests "a lower level of both pain and functional limitation.")  Dr. Narala  treated plaintiff's carpal tunnel syndrome with Celebrex, which had been prescribed for plaintiff's degenerative arthritis.  Such treatment is inconsistent with the Dr. Narala's conclusion that plaintiff cannot use his hands for reaching, handling, pushing, pulling and grasping during an eight-hour work day. (AR 164, 206, 247.)  Plaintiff points to no meaningful error in the ALJ's evaluation of Dr. Narala's sweeping restrictions.

**Development Of Record**

Plaintiff faults the ALJ for failing to clarify or to develop the record.  The Commissioner responds that the plaintiff failed to explain what should have been clarified or developed.

"An ALJ's duty to develop the record further is triggered only when there is ambiguous evidence or when the record is inadequate to allow for proper evaluation of the evidence." *Mayes v. Massanari*, 276 F.3d 453, 460 (9th Cir. 2001).  Here, there is no suggestion of an ambiguous or inadequate record.  The ALJ fully addressed Dr. Narala's opinion and adequately discounted it.   Plaintiff fails to demonstrate grounds to further develop the record.

**Listing Of Impairments**

Plaintiff also argues that "there is little review of any of [his] impairments in the decision."  The Commissioner responds that plaintiff failed to "make any cogent argument as to why these diagnoses

1    color the ALJ's rejection of Dr. Narala's opinion."

2         The purpose of the Listing of Impairments is to describe impairments "severe enough to prevent

3    a person from doing any gainful activity." *Sullivan v. Zebley*, 493 U.S. 521, 532, 110 S.Ct. 885 (1990)

4    (quoting Social Security Ruling (SSR) 83-19, Dept. of Health and Human Services Rulings 90 (Jan.

5    1983)). If a claimant meets or equals a listed impairment, he/she is disabled. *Tackett*, 180 F.3d at 1099.

6         The United States Supreme Court has explained application of the Listing of Impairments:

7              The listings . . . are descriptions of various physical and mental illnesses and
8         abnormalities, most of which are categorized by the body system they affect. Each
          impairment is defined in terms of several specific medical signs, symptoms, or laboratory
9         test results. For a claimant to show that his impairment matches a listing, it must meet
          *all* of the specified medical criteria. An impairment that manifests only some of those
10        criteria, no matter how severely, does not qualify. . . . "The level of severity in any
          particular listing section is depicted by the *given set* of findings and not by the degree of
11        severity of any single medical finding – no matter to what extent that finding may exceed
          the listed value."

12                  . . .

13

14             The [Commissioner] explicitly has set the medical criteria defining the listed
         impairments at a higher level of severity than the statutory standard. The listings define impairments that would prevent an adult, regardless of his age, education, or work experience,
15   from performing *any* gainful activity, not just "substantial gainful activity."

16
     *Sullivan v. Zebley*, 493 U.S. 521, 530-531, 110 S.Ct. 885 (1990) (italics in original; citations omitted).

17
18        "While the Listing of Impairments does describe conditions that are generally considered severe

19   enough to prevent a person from doing any gainful activity, an ALJ should not consider a claimant's

20   'impairment to be one listed in Appendix 1 solely because it has the diagnosis of a listed impairment.

21   It must also have the **findings** shown in the Listing of that impairment.'" *Young v. Sullivan*, 911 F.2d

22   180, 184 (9th Cir. 1990) (quoting 20 C.F.R. § 404.1525(d)); *Key v. Heckler*, 754 F.2d 1545, 1549-1550

23   (9th Cir. 1985)) (bold added).

24        Plaintiff bears the burden of proof to demonstrate that he has an impairment that meets or equals

25   one of the listed impairments. *Tackett*, 180 F.3d at 1098. To "meet" a listed impairment, a claimant

26   must establish that he or she meets each characteristic of a listed impairment relevant to his/her claim.

27   *Tackett*, 180 F.3d at 1099. To "equal" a listed impairment, a claimant must establish symptoms, signs

28   and laboratory findings at least equal in severity and duration to the characteristics of a relevant listed

                                                15

1   impairment. *Tackett*, 180 F.3d at 1099. Medical equivalence must be based on medical findings in the

2   evidence supported by medically acceptable clinical and laboratory diagnostic techniques. *Tackett*, 180

3   F.3d at 1100; 20 C.F.R. §§ 404.1526(b) and 416.926(b).

4          As a matter of law, the ALJ need not "state why a claimant failed to satisfy every different

5   section of the listing of impairments," in particular when the ALJ's evaluation of the evidence is an

6   adequate statement of the "foundations on which the ultimate factual conclusions are based." *Gonzalez*

7   *v. Sullivan*, 914 F.2d 1197, 1201 (9th Cir. 1990). "An ALJ is not required to discuss the combined effects

8   of a claimant's impairments or compare them to any listing in an equivalency determination, unless the

9   claimant presents evidence in an effort to establish equivalence." *Burch*, 400 F.3d at 683; *see Lewis v.*

10  *Apfel*, 236 F.3d 503, 514 (9th Cir. 2001).

11         In the case at hand, the ALJ correctly concluded that the "claimant has no impairment or

12  combination of impairments that meet or equal any impairment listed in" the Listing of Impairments.

13  (AR 18.)   The ALJ thoroughly evaluated the medical evidence. (AR 18-21.)   Plaintiff points to

14  insufficient medical signs, symptoms or laboratory test results to demonstrate that his alleged conditions

15  meet or equal an impairment in the Listing of Impairments.  Plaintiff comes no where close to meeting

16  his burden that his condition meets or equals an impairment in the Listing of Impairments.

17                                  **Plaintiff's Credibility**

18         Plaintiff challenges the ALJ's evaluation of his subjective statements and argues that the ALJ

19  "failed to give adequate reasons for rejecting [his] credibility."  The Commissioner responds that the

20  ALJ provided "clear reasons for rejecting [p]laintiff's subjective account of his limitations."

21         "Credibility determinations are the province of the ALJ." *Fair*, 885 F.2d at 604; *Russell v.*

22  *Bowen*, 856 F.2d 81, 83 (9th Cir. 1988).  "An ALJ cannot be required to believe every allegation of

23  disabling pain." *Fair*, 885 F.2d at 603. An ALJ "may disregard unsupported, self-serving statements."

24  *Flaten v. Secretary of Health & Human Services*, 44 F.3d 1453, 1464 (9th Cir. 1995).

25         A claimant bears an initial burden to "produce objective medical evidence of underlying

26  'impairment,' and must show that the impairment, or a combination of impairments, 'could reasonably

27  be expected to produce pain or other symptoms.'" *Baston v. Commissioner of Social Security Admin.*,

28  359 F.3d 1190, 1196 (9th Cir. 2004) (quoting *Smolen v. Chater*, 80 F.3d 1273, 1281 (9th Cir. 1996)).  If

a claimant satisfies such initial burden and "if the ALJ's credibility analysis of the claimant's testimony shows no malingering, then the ALJ may reject the claimant's testimony about severity of symptoms with 'specific findings stating clear and convincing reasons for doing so.'" *Baston*, 359 F.3d at 1196 (quoting *Smolen*, 80 F.3d at 1284.)  "If the ALJ finds that the claimant's testimony as to the severity of her pain and impairments is unreliable, the ALJ must make a credibility determination with findings sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily discredit claimant's testimony." *Thomas v. Barnhart*, 278 F.3d 947, 958 (9th Cir. 2002).

If an ALJ's credibility finding is supported by substantial evidence in the record, a reviewing court may not engage in second-guessing. *Thomas*, 278 F.3d at 959.  A reviewing court will not reverse an ALJ's credibility determinations "based on contradictory or ambiguous evidence."  *Johnson v. Shalala*, 60 F.3d 1428, 1434 (9th Cir. 1995) (citing *Allen v. Heckler*, 749 F.2d 577, 579 (9th Cir. 1984)). "So long as the adjudicator makes specific findings that are supported by the record, the adjudicator may discredit the claimant's allegations based on inconsistencies in the testimony or on relevant character evidence." *Bunnell v. Sullivan*, 947 F.2d 341, 346 (9th Cir. 1991).  Moreover, "the ALJ is entitled to draw inferences 'logically flowing from the evidence.'" *Macri v. Chater*, 93 F.3d 540, 544 (9th Cir. 1996) (quoting *Sample v. Schweiker*, 694 F.2d 639, 642 (9th Cir. 1982)).

In *Light v. Social Sec. Admin.*, 119 F.3d 789, 792 (9th Cir. 1997), the Ninth Circuit commented:

> In weighing a claimant's credibility, the ALJ may consider his reputation for truthfulness, inconsistencies either in his testimony or between his testimony and his conduct, his daily activities, his work record, and testimony from physicians and third parties concerning the nature, severity, and effect of the symptoms of which he complains. *Smolen*, 80 F.3d at 1284; *Moncada v. Chater*, 60 F.3d 521, 524 (9th Cir. 1995) (quoting *Orteza v. Shalala*, 50 F.3d 748, 749-50 (9th Cir. 1995)); 20 C.F.R. § 404.1529(c).  An ALJ's finding that a claimant generally lacked credibility is permissible basis to reject excess pain testimony.

*See also* S.S.R. 96-7p.[3]

---

[3]     Social Security Ruling 96-7p sets out factors to assess a claimant's credibility: (1)  claimant's daily activities; (2) location, duration, frequency, and intensity of the claimant's pain or other symptoms; (3) factors that precipitate and aggravate the symptoms; (4) type, dosage, effectiveness, and side effects of any medication the claimant takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, the claimant receives or has received for relief of pain or other symptoms; (6) measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing 15 to 20 minutes every hour, or sleeping on a board); and (7) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

An ALJ may consider the following factors to determine the credibility of a claimant's allegations of disabling pain:

1.  The nature, location, onset, duration, frequency, radiation, and intensity of any pain;

2.  Precipitating and aggravating factors (e.g., movement, activity, environmental conditions);

3.  Type, dosage, effectiveness, and adverse side-effects of pain medication;

4.  Treatment, other than medication, for pain relief;

5.  Functional restrictions;

6.  Claimant's daily activities;

7.  Unexplained, or inadequately explained, failure to seek treatment or to follow up a prescribed course of treatment; and

8.  Ordinary techniques to test a claimant's credibility.

*Bunnell*, 947 F.2d at 346; *see* 20 C.F.R. §§ 404.1529, 416.929.

After detailing plaintiff's medical treatment and testimony, the ALJ thoroughly addressed plaintiff's credibility:

> I have also fully considered the claimant's subjective complaints, but find, first that they fail to establish the degree of limitation the claimant asserts, secondly, that they are minimally credible because they are minimally supported by treatment records or objective evidence, and thirdly, that they are contradicted by the claimant's daily activities.

> The claimant testified that he is last worked as a security guard and that he quit this work not because of an impairment, but he also admitted this is a symptom of his diabetes. Later, he testified that he stopped working because of pain. The claimant said, however, that this last work as a security guard involved patrolling shopping center parking lots while in a car, and he proposed no testimony that would suggest he was then or is now physically unable to perform the work. The claimant alleges his records support impairments of gout and diabetic neuropathy with foot pain, but neither impairment precludes the security work job duties as the claimant described this work. Notably, the claimant continues to drive a car with a standard transmission, and more than that, he drives on daily basis at his own option. Thus, I am unable to give great credence to claims that the claimant is unable to drive or that he has problems with work that primarily entails driving.

> The claimant also testified that he cannot work because he must urinate every 30 minutes, but he also admitted this is a symptom of his diabetes. He stated that when he follows a diabetic regime, frequent urination is not a problem. The claimant also admitted he does not follow a diabetic diet, and he appeared to hold little concern for his diabetic condition. The claimant said, in fact that he follows the diet prescribed by his physician only a "little bit." Nonetheless, there is nothing in the record to suggest that the claimant's diabetes is not controllable, should the claimant make the effort, and when

1    controlled, not only leaves the claimant with minimized symptoms, but also alleviates
     his need for or tendency to frequent urination.

2

3    In addition, the claimant's daily activities appear quite normal.  He testified he drives his
     children to and from school on a daily basis (even though he does not have to and his
     wife also drives).  He has stated that he does not cook or clean because of pain (Exhibit
4    6E, p.1), but without a medical explanation, this appears wholly volitional in nature.  A
     Social Security Administration Representative observed the claimant had no difficulties
5    reading, writing, answering questions translated by his daughter, using his hands or
     sitting.  Although the representative noted the claimant had some difficulty walking, he
6    ambulated without and assistive device (Exhibit 5E, p.5).  (AR 20-21.)

7        The ALJ provided specific findings and clear, convincing reasons to discredit plaintiff.  The ALJ

8    pointed to inconsistencies in the plaintiff's testimony describing why he left his job in that plaintiff

9    originally stated he left due to language difficulties but later stated he left because of pain. (AR 278-

10   279.)  The ALJ noted inconsistencies between the plaintiff's testimony and his conduct.  Plaintiff

11   testified that he usually drives his children in a car with a standard transmission to and from school on

12   a daily basis but claimed more often than not, he is unable to walk without a crutch because of suffering

13   from severe and intractable joint pain from gout. (AR 277, 281.)  Further, the ALJ cited the plaintiff's

14   failure to follow his prescribed course of treatment, that is, his diabetic regimen and diet.  Plaintiff

15   testified that the doctor tells him to "eat a lot of meat," but plaintiff eats "some rice and vegetable[s] and

16   a little bit [of] meat." (AR 289.)  The ALJ noted that plaintiff testified that when he follows his diet, his

17   frequent urination is lessened. (AR 285.)  Moreover, plaintiff declined testing and more aggressive

18   medical options to suggest he exaggerated his symptoms.  (AR 231.)  In short, plaintiff's treatment and

19   the objective medical evidence are inconsistent with the degree of limitations claimed by plaintiff.

20       Substantial evidence supports the ALJ's specific findings on plaintiff's credibility to preclude

21   this Court to second guess the ALJ.  Plaintiff fails to demonstrate error in the ALJ's evaluation of

22   plaintiff's credibility.

23                              **Plaintiff's Other Complaints**

24       Further, plaintiff in an incongruous manner attempts to argue that the ALJ failed to rule on

25   counsel's objection "without getting confirmation of [Dr. Damania]'s current resume and

26   qualifications."  Plaintiff misstates the record.  The ALJ asked if there were any objections to the

27   exhibits being admitted to the record, and plaintiff's attorney responded "[n]o objection, your honor."

28   (AR 274.)  Although plaintiff's attorney requested Dr. Damania's credentials, plaintiff's counsel made

                                          19

1    not objection on which to rule.

2         Plaintiff also argues that the ALJ "failed to even provide plaintiff with time to fully testify."

3    Plaintiff's brief does not identify evidence which plaintiff was precluded to present or how a time limit

4    weakened his case.  The record shows that plaintiff's attorney thanked the ALJ and "noted several times

5    where [plaintiff] was not going with the yes and no's and [the ALJ] continued to ask questions, and [he]

6    appreciate[s] that diligence." (AR 291.)  Accordingly, the time limit does not afford a ground for

7    reversal because plaintiff cannot show preclusion to present thoroughly his case. *See United States v.*

8    *Scott*, 789 F.2d 799 (9th Cir. 1986) (upholding time limit on testimony where the fact finder received

9    a full picture and any further testimony would have been cumulative).

10                        **CONCLUSION AND RECOMMENDATION**

11        For the reasons discussed above, this Court finds no error in the ALJ's analysis and that the ALJ

12   properly concluded plaintiff is not disabled.  This Court further finds the ALJ's decision is supported

13   by substantial evidence in the record as a whole and based on proper legal standards.  Accordingly, this

14   Court RECOMMENDS to:

15        1.    DENY plaintiff's request to reverse the Commissioner's decision to deny plaintiff

16              disability insurance benefits and SSI or to remand for further proceedings; and

17        2.    DIRECT this Court's clerk to enter judgment in favor of defendant Jo Anne B. Barnhart,

18              Commissioner of Social Security, and against plaintiff Dang Vang and to close this

19              action.

20        These findings and recommendations are submitted to the district judge assigned to this action,

21   pursuant to 28 U.S.C. § 636(b)(1)(B) and this Court's Local Rule 72-304.  No later than May 17, 2006,

22   any party may file written objections to these findings and recommendations with the Court and serve

23   a copy on all parties and the magistrate judge and otherwise in compliance with this Court's Local Rule

24   72-304(b).  Such a document should be captioned "Objections to Magistrate Judge's Findings and

25   Recommendations."  Responses to objections shall be filed and served no later than May 26, 2006 and

26   otherwise in compliance with this Court's Local Rule 72-304(d).  A copy of the responses shall be

27   served on the magistrate judge.  The district judge will review the magistrate judge's findings and

28   recommendations, pursuant to 28 U.S.C. § 636(b)(1)(c).  The parties are advised that failure to file

objections within the specified time may waive the right to appeal the district judge's order.  *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

**Dated:**      **April 28, 2006**                        _____/s/ Lawrence J. O'Neill_____
66h44d                                          UNITED STATES MAGISTRATE JUDGE

21